**U.S. BANKRUPTCY COURT**
**District of South Carolina**

Case Number:  **08-04215-hb**
Adversary Proceeding Number:  **09-80052-hb**

## ORDER ON DEFENDANT'S MOTION TO ALTER OR AMEND

The relief set forth on the following pages, for a total of 13 pages including this page, is hereby ORDERED.

**FILED BY THE COURT**
**07/30/2010**



US Bankruptcy Judge
District of South Carolina

Entered: 07/30/2010

# UNITED STATES BANKRUPTCY COURT

# FOR THE DISTRICT OF SOUTH CAROLINA

| | |
|---|---|
| In re,<br><br>Joe Gibson's Auto World, Inc.,<br><br>                             Debtor, | C/A No. 08-04215-HB<br><br>Adv. Pro. No. 09-80052-HB |
| Joe Gibson's Auto World, Inc.,<br><br>                            Plaintiff(s),<br><br>vs.<br><br>Zurich American Insurance Company and<br><br>Universal Underwriters Insurance Company,<br><br>                          Defendants. | Chapter 11<br><br>**ORDER ON DEFENDANTS'**<br>**MOTION TO ALTER OR AMEND** |

On May 18, 2010, this Court entered an Order granting Plaintiff's Motion to Compel (Docket #128). On June 1, 2010, Defendants filed their Motion and Memorandum to Alter or Amend Order Regarding Plaintiff's Motion to Compel and a Motion for Protective Order[1] ("Motion to Alter Order" Docket #s 136, 137). Plaintiff filed a Reply on June 18, 2010. After a review of the Motion to Alter Order, Reply and supporting documents, the Court enters this Order to provide further clarification and alteration as needed. This Order replaces the Court's prior Order issued in this matter by addressing Defendants' claims of attorney/client privilege and directs the Defendants to present certain other documents to the Court for an *in camera* review.

---

[1] An Amended Motion and Memorandum to Alter or Amend Order Regarding Plaintiff's Motion to Compel and a Motion for a Protective Order were filed on the same day, June 1, 2010.

**Background**

This adversary proceeding pleads causes of action by an insured party against its alleged insurer for breach of contract, bad faith refusal to pay claims, bad faith failure to settle and for a declaratory judgment.[2]

Plaintiff served discovery requests on Defendants.[3] Defendants objected to the production of certain documents claiming that production of some was not required because they are protected by the attorney/client privilege and/or because they are Defendants' work product prepared in anticipation of litigation. Defendants provided a Second Amended Privilege Log identifying and describing documents and stating the privilege claimed.

This adversary proceeding arose out of hundreds of consumer claims and suits filed against Plaintiff in other forums, and from insurance coverage provided by Defendants to Plaintiff under a policy period that began on November 1, 2006, and continued until November 1, 2008. The insurance policy ("Policy") was divided into multiple sections, providing different types of coverage. Defendants provided some defense to Plaintiff under a reservation of rights. Defendants hired attorney Clay Walker to defend Plaintiff. Facing insurmountable consumer claims, Plaintiff filed for Chapter 11 bankruptcy protection on July 16, 2008. Plaintiff employed separate bankruptcy counsel, but Walker continued to represent Plaintiff in the litigation matters as needed at Defendants' direction. In September of 2008, Plaintiff informed Defendants of the intention to initiate this adversary action on behalf of the bankruptcy estate and its creditors.

---

[2] The bad faith failure to settle cause of action was first alleged in the Amended Complaint filed on April 30, 2010.

[3] Defendant Zurich has repeatedly asserted that the proper party is Universal Underwriters Insurance Company, and the Court recently granted Plaintiff's Motion to add that company as an additional Defendant, over the Objections of Defendants. Defendants assert that only Defendant Universal should be named. Hereinafter for convenience the Court will make reference generically to "Defendants" for the purposes of this Order only. Any statements of fact or conclusions of law using the term "Defendants" shall not be interpreted as a finding as to whether either Defendant is the proper party.

Defendants later hired bankruptcy counsel and coverage counsel to prepare for this litigation. Thereafter in December of 2008, mediation took place relating to the numerous consumer claims pending against Plaintiff. In February of 2009, a Global Settlement Agreement ("GSA") resulted between Plaintiff, Defendants and various other parties in the bankruptcy and litigation. Disputes involving the interpretation of the GSA arose thereafter. Over the objections of Defendants, the settlement set forth in the GSA was approved and its terms were incorporated into the Chapter 11 Plan by order confirming that plan dated June 29, 2009.

The Defendants' Privilege Log lists communications that occurred between Defendants (the insurance company) and Walker (the attorney hired by the insurance company to represent the insured). Although attorney Walker was hired by Defendants to represent Plaintiff, Defendants claim that certain documents involving Walker are shielded from production to Plaintiff based on an attorney/client privilege existing between the insurance company and the attorney it hired to defend the insured—a relationship that excluded the insured.

Plaintiff called the Court's attention to pleadings filed with the Court in this case indicating Walker's relationship with the Plaintiff and Defendants. In documents filed related to the interpretation, approval and enforcement of the GSA, *Plaintiff* asserted that in addition to representing Plaintiff in the pending consumer claim litigation, Walker also provided legal representation to Defendants while the GSA was negotiated and eventually executed the GSA on behalf of Defendants. *Defendants* disputed this claim by filing a document which stated: "[i]t is undisputed that Mr. Walker represented Joe Gibson, not [Defendants] . . . No one can fairly claim that Walker represented [Defendants] . . . Walker never negotiated on behalf of [Defendants], [and] only communicated [Defendants'] position to the other Participating Parties." Defendants also filed the Affidavit of Senior Liability Specialist, Patti Gay, on June 19,

3

2009, stating that Defendants hired Walker to represent Plaintiff. Gay referred to Walker as "Gibson's attorney." She also stated that, as a result of a settlement conference in February 2009, "[s]everal drafts of [the GSA] . . . were sent to me [Gay] by Walker." She further stated, "Walker forwarded the final draft to me on the evening of February 18, 2009, which I reviewed on the morning of February 19, 2009. While Walker had some concerns about some language, I thoroughly reviewed the agreement as a whole and concluded that it accurately reflected . . . [Gay's understanding of the agreement]." To explain why Walker signed the GSA on behalf of Defendants, Gay stated that it was "for convenience sake only." The Court's records in this case also include the Affidavit of Walker, dated June 19, 2009, wherein he stated:

> To my knowledge, I was the only person who communicated offers and demands to and from the insurer [Defendants herein] during the negotiations that led to the GSA. At no time did I act in these negotiations as counsel for the insurer. I represented Joe Gibson and the companies which bear his name [including Plaintiff].

With regards to the December 2008 mediation, Walker stated:

> I had not been retained to represent the interest of the insurer at this mediation. Any viable resolution of the . . . claims against the Gibson defendants would obviously benefit [the Gibson defendants]. . . . I was, to my knowledge, the sole person who communicated various positions, demands and offers to and from the insurer.

Referencing the February 2009 settlement conference, Walker asserted that his involvement was "somewhat limited", but that his efforts "focused on fashioning a method to confirm a minimum contribution to be made by the insurer."

### Attorney/Client Privilege

"The attorney/client privilege protects against disclosure of confidential communications by a client to his or her attorney." *Crawford v. Henderson*, 589 S.E.2d 204, 207 (S.C. Ct. App.

2003). The burden of establishing the attorney/client privilege rests on the party asserting it. *State v. Love*, 271 S.C. 55 (S.C. 1980); *United States v. (Under Seal)*, 748 F.2d 871, 876 (4th Cir. 1984); *United States v. Jones,* 696 F.2d 1069, 1072 (4th Cir. 1982).

South Carolina courts recognize the following essential elements giving rise to the Privilege:

> (1) Where legal advice of any kind is sought (2) from a professional legal adviser in his capacity as such, (3) the communications relating to that purpose (4) made in confidence (5) by the client, (6) are at his instance permanently protected (7) from disclosure by himself or by the legal advisor, (8) except that the protection be waived. *State v. Doster,* 276 S.C. 647, 651 (S.C. 1981).

The party seeking to assert the Privilege has the burden of demonstrating its applicability. *In Re Worldwide Wholesale Lumber, Inc*., Adv. Pro. No. 07-80008-w, slip op. at 4 (Bankr. D.S.C. Apr. 2, 2008).

Many jurisdictions, including South Carolina, strictly construe the attorney/client privilege. *Crawford*, 589 S.E.2d at 207; *Doster*, 276 S.C at 651. Under a strict construction of the attorney/client privilege, the party "asserting the privilege must show that the relationship between the parties was that of attorney and client, and that the communications were confidential in nature." *Crawford*, 589 S.E.2d at 207. "[T]he privilege must be tailored to protect only confidences disclosed within the relationship." *Doster*, 276 S.C. at 651.

The reasoning behind strict construction of the attorney/client privilege "is that evidence excluded under the privilege is not necessarily incompetent." *Id.* "The public policy protecting confidential communications must be balanced against the public interest in the proper administration of justice." *Id.* "Although the privilege has a venerable pedigree and helps to

ensure competent and complete legal services, it is nonetheless inconsistent with the general duty to disclose . . . " *(Under Seal)*, 748 F.2d at 875.

"[T]he privilege 'impedes [the] full and free discovery of the truth,' and is 'in derogation of the public's "right to every man's evidence . . . ."'" *In re Grand Jury Proceedings*, 727 F.2d 1352, 1355 (4th Cir. 1984) (quoting *Weil v. Investment/Indicators, Research & Management*, 647 F.2d 18, 24 (9th Cir. 1981) and *In Re Horowitz*, 482 F.2d 72, 81 (2d. Cir. 1973)). Thus, the privilege must be strictly construed and "confined within the narrowest possible limits consistent with the logic of its principle". *In re Grand Jury Proceedings*, 717 F.2d at 1355.

**Defendants' privilege claims**

Defendants assert the attorney/client privilege as a bar to the production of numerous documents involving Walker. To the extent that Walker was not providing "legal advice . . . relating to [communications] . . . made in confidence . . . by the client", the attorney/client privilege is inapplicable. *See Doster*, 276 S.C. at 651. Walker was the attorney hired by Defendants (the insurer) to represent Plaintiff (the insured) against claims made by third parties, thereby forming a tripartite relationship between Plaintiff, Defendants and Walker. Some courts have found that such a relationship presupposes the absence of secrecy between the parties. *See Eureka Inv. Corp., N.V. v. Chicago Title Ins. Co.*, 743 F.2d 932, 937 (D.C. Cir. 1984). Further, other than the fact that Defendants hired Walker to represent Plaintiff in dealing with the consumer claims, there is no evidence as to the nature of the relationship between Defendants and Walker such that the Court could conclude that an attorney/client privilege attaches to communications between them to the exclusion of Plaintiff, and in fact, Defendants have disclaimed any such relationship in pleadings filed with this Court. As a result, Defendants cannot sincerely assert any reasonable expectations of confidentiality in these communications

with Walker that would shield the documents from production to the Plaintiff, who was represented by Walker at Defendants' request. There is no evidence that the relationship between Walker and Defendants has the characteristics required to assert the attorney/client privilege against Plaintiff. *See Doster,* 276 S.C. at 651.

The parties discussed, and many jurisdictions have widely recognized, what has been referred to by some as the "common-interest" or "joint client" doctrine. That doctrine provides that when an attorney who has represented or consulted with both of the subsequently opposing parties on a matter of common interest, the prior communications between the attorney and either of the parties are not protected by the attorney/client privilege. *See e.g. Nationwide Mut. Fire Ins. Co. v. Bourlon*, 172 N.C. App. 595, 603(N.C. Ct. app. 2003). This doctrine has been held to be specifically applicable in the context of insurance litigation. *Id.* The rule has been applied where insurers have denied their obligation to defend, where a lack of coverage was alleged, and for the negligent failure to settle covered claims, among other situations. *4 A.L.R.4th 765, II*. The extent of the common interests between the parties need not be entirely congruent. *Restat 3d of the Law Governing Lawyers*, § 76(2)(e). The common interest doctrine has been applied where there was a "unity of interest", despite the parties involved having separate and independent motivation underlying this interest. *Hunton & Williams v. United States DOJ,* 590 F.3d 272, 282 (4th Cir. Va. 2010) *Hunton* elaborated that where the parties are working to "achieve a legal result beneficial to both", courts should be "attentive both to when a common interest is formed and to what communications lie within the scope of that interest". *Id.* at 286.

The Fourth Circuit has recognized that the common interest doctrine allows persons sharing a "common interest in litigation to more effectively communicate with their respective attorneys and with each other in order to better pursue or defend their claims." *In Re Worldwide*

*Wholesale Lumber, Inc.*, Adv. Pro. No. 07-80008-w, slip op. at 8 (Bankr. D.S.C. Apr. 2, 2008). This doctrine applies whether the action is ongoing or contemplated and prevents the attorney/client privilege as between the interested parties from being waived with regards to third parties not involved in the litigation. *Id.*

The Fourth Circuit has also recognized, "when the same attorney acts for two parties having a common interest and each party communicates with him . . . [the] communications are clearly privileged at the instance of a third party. Yet they are not privileged in a controversy between the two original parties". *In Re Ducane Gas Grills*, Adv. Pro. No. 04-80160 (Bankr. D.S.C. Oct. 7, 2004) (quoting 8 WIGMORE, EVIDENCE § 2312 (McNaughten rev. 1961)). In a similar Fourth Circuit case, where the insurer hired an attorney to defend an insured, the Court held that "where two parties are represented by the same attorneys for their mutual benefit, the communications between the parties are not privileged in a later action between such parties or their representatives." *Chitty v. State Farm Mut. Auto. Ins. Co.,* 36 F.R.D. 37, 41 (D.S.C. 1964). That Court stated that good public policy dictates that such communications are not privileged in later actions between the parties because there is an assumption that no confidential information is being disclosed by either of the parties so long as the dual attorney relationship exists. *Id.* at 42.

The evidence here indicates that Walker was hired by Defendants/insurer to represent Plaintiff/insured prior to, during and for a period of time after the Plaintiff filed for bankruptcy protection on July 16, 2008. The common-interest doctrine would presumably apply to all communications made between the parties forming the tripartite relationship during this time of common representation, relating to the defense of the underlying claims.

Defendants contend that the hiring of other counsel by Plaintiff in September, 2008 and Plaintiff's preparation for litigation against Defendants signifies the "divergence of the common interest" between the Parties, and accordingly, this Court should "not deprive Universal [Defendants] of the privilege as to communications between Walker and Universal that were not in the common interest of Universal and Auto World [Plaintiff]". However, the fact that a dispute arose between the parties is irrelevant as long as the tripartite relationship continued to exist, as to relevant communications within that relationship. In fact, the common-interest doctrine seems to be highly applicable in situations where the parties subsequently find themselves involved in a dispute. The mere fact that each party hired separate legal counsel does not mean that the tripartite relationship ended as between Plaintiff, Defendants and Walker at that time or at all.

Defendants cite *Eureka Inc. Corp., N.V. v. Chicago Title Ins. Co.*, 743 F.2d 932 (D.C. Cir. 1984) to support their contention that the alleged divergence of the common interest allows Defendants to assert the privilege against Plaintiff so that Plaintiff cannot obtain communications between Walker and Defendants. In *Eureka*, the insured and the insurer, involved in a dispute resulting from that relationship, were initially represented by a common attorney. After the dispute arose, the plaintiff/insured was seeking protection from discovery sought after by the defendant/insurer. *Id.* However, the case at hand is distinguishable from *Eureka*. In *Eureka*, the plaintiff and the attorney "began planning legal action" against the defendant such that the defendant admitted that in preparing certain sought after documents the "[plaintiff] and [attorney] were acting against [the defendant's] interest". *Id.* at 936. That Court found that documents not protected from disclosure were those made in connection with the two parties' joint representation by the common attorney, but where the attorney "represented [the plaintiff]

9

individually" the documents were found to be protected by the privilege. *See id.* at 936. Defendants argue that because "Plaintiff was planning a lawsuit against [Defendants]" an "exception to the general rule and [] a reasonable expectation of confidentiality [was created]".

Although Plaintiff may have begun preparing for a lawsuit at some point in time, this fact does not necessarily have any bearing on Defendants' own reasonable expectation of confidentiality as between it and Walker, nor does the evidence support that Defendants were "represented individually" by Walker. Furthermore, it is not plausible to make such an assertion, as Defendants and Plaintiff hired separate legal counsel to represent each interest in the bankruptcy and adversary proceedings, and no evidence has been produced by either Party to show that Walker's involvement ever evolved to more than representation of both parties in favorably resolving the defense of the underlying claims.

In Walker's affidavit, he stated that he was hired by Defendants to defend Plaintiff against various consumer claims. He facilitated communications between Plaintiff and Defendants pursuant to the December 2008 mediation, stating that although he did not represent the insurer at this point, he was the "sole person who communicated various positions, demands and offers to and from the insurer." Walker stated that he sought a "viable resolution" of the claims such that the "Gibson defendants" (Plaintiff in this action) should benefit. Regarding the settlement conference of February, 2009, Walker stated that his efforts focused on obtaining a "minimum contribution to be made by the insurer [Defendants]." Walker's overall view of his role, as expressed in his affidavit, appears to have been to secure a resolution of the claims so as to benefit both Plaintiff and Defendants. There is no evidence that this relationship changed since that time.

The common interest or joint client doctrine does not preclude all communications within the tripartite relationship from claims of privilege by another party to that relationship. The Court in *Nationwide Mut.* found that the privilege still attaches regarding communications unrelated to the defense of the underlying claims and to issues adverse between the insurer and the insured. *Nationwide Mut,.* 172 N.C. App. at 605. Although Defendants argue that the fact that Plaintiff made its intent to pursue an action against Defendants known in September of 2008 means that the common interest doctrine no longer applied as of that date-- as the Plaintiff was "planning a lawsuit against Universal", creating a "reasonable expectation of confidentiality" between Walker and Defendants-- neither party has argued, nor does the record reflect, that Walker discontinued his representation of Plaintiff with regards to the underlying claims defense and/or settlement at that time, or that he properly changed the nature of his representation in any way. An "attorney may properly act as an attorney for both parties to a transaction with the full knowledge and consent of both, but when a conflict of interest arises in the matter, he must make full disclosures to both or terminate the relation of attorney and client as to both." *Chitty* 36 F.R.D. at 41 (citing *State v. Rogers*, 226 Wis. 39, 48 (Wis. 1937)). There is no evidence that Walker took such action or that the relationship changed as between Walker and the other parties to the relationship, despite their disputes.

The items indicated as Privilege Log Nos. 9-15, 19-21, 23-24, 26 and 28 must be produced by Defendants as they are not shielded from production by the attorney/client privilege.

Further, the Court reviewed these documents provided for an *in camera* review and found no support therein for Defendants' claims that the documents are shielded from production to Plaintiff under theories of attorney/client privilege.[4]

**Defendants' claims of work product privilege**

Regarding the remaining items on the Privilege Log and any claims of a work product privilege, Defendants shall provide a copy of those documents, Log Nos. 16-18 and 29 to the Court for an *in camera* review and an order will be entered thereafter regarding those matters. Pending such a review, Defendants shall not be required to produce those documents.

**IT IS THEREFORE, ORDERED**:

1. That the Motion to Alter or Amend is granted in part and as a result, this Order replaces the Court's prior Order on this matter, Docket #118;

2. That Privilege Log Nos. 9-15, 19-21, 23-24, 26 and 28 must be produced by Defendants.

3. That Defendants shall provide a copy of the documents referenced in Privilege Log Nos. 16-18 and 29 for an *in camera* review and an order will be entered thereafter regarding those matters.

**AND IT IS SO ORDERED.**

---

[4] Log No. 19 was not provided for review when the other documents were transmitted to the Court although it is mentioned in Defendants' Motion. The Court's notes indicate that Defendants agreed to produce this document.